UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **NOEL F. WHITTAKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 18-cv-01434 (APM)** |
| | ) | |
| **UNITED STATES DEPARTMENT OF** | ) | |
| **JUSTICE, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**MEMORANDUM OPINION**

## I.      INTRODUCTION

As part of a background investigation or pre-employment vetting of a person, a federal agency may ask the Federal Bureau of Investigation ("FBI") to conduct what is known as a National Agency Check.   The FBI reviews its records and provides the results to the requesting agency.   Plaintiff Noel F. Whittaker had a National Agency Check done in 2007 as part of a background investigation.   Years later, Plaintiff made a Freedom of Information Act ("FOIA") request seeking a complete record of the 2007 background investigation, but the FBI withheld the results of the National Agency Check.   Plaintiff then brought this action to obtain the results. During the initial round of summary judgment briefing, Defendants claimed that the withholding was justified under FOIA Exemption 7(E), a provision meant to protect law enforcement techniques and procedures from disclosure.   After the court found that Defendants had not sufficiently specified the techniques and procedures implicated in Plaintiff's name check results, it denied Defendants' motion.   Defendants now renew their motion and submit a supplemental declaration justifying their withholding under Exemption 7(E).   For the reasons that follow, the court grants Defendants' renewed motion for summary judgment.

## II.      BACKGROUND

### A.      Factual Background

Plaintiff is a retired analytical chemist.  Am. Compl., ECF No. 12 [hereinafter Am. Compl.], ¶ 3.  He worked for the National Institutes of Health ("NIH") from 1974 to 2002 and at the University of Maryland Department of Chemistry from 2002 to 2007.  *Id.*  In 2007, he returned to NIH as a vendor employed by Kelly Services.  *Id*.  In connection with his return, Plaintiff underwent a background investigation.  *Id.* ¶ 4.

On February 24, 2014, pursuant to FOIA, Plaintiff sought a copy of his background investigation report from the United States Office of Personnel Management ("OPM").  *Id.* ¶ 5. On March 3, 2014, OPM released the report to Plaintiff but redacted one portion—Plaintiff's National Agency Check results—based on a request by the FBI.  *See id*. ¶¶ 6–7; Defs.' Renewed Mot. for Summ. J., ECF No. 26 [hereinafter Defs.' Mot.], Defs.' Mem. in Supp. of Renewed Mot. for Summ. J., ECF No. 26-1 [hereinafter Defs.' Mem.], at 1.  On April 30, 2014, Plaintiff appealed the withholding to the Director of the Office of Information Policy of the United States Department of Justice.  Am. Compl. ¶ 8.  On July 17, 2014, the Chief Administrative Appeals Staff of the Office of Information Policy denied Plaintiff's appeal.  *Id*. ¶ 9.

### B.      Procedural History

Having exhausted his administrative remedies under FOIA, Plaintiff initiated this action on June 18, 2018.  *See* Am. Compl.  On November 15, 2018, Defendants OPM and the Department of Justice moved for summary judgment, defending their withholding of the National Agency Check results under FOIA Exemption 7(E).  *See* Defs.' Mot. for Summ. J., ECF No. 16 [hereinafter Defs.' First Mot.], Defs.' Mem. in Supp. of Mot. for Summ. J., ECF No. 16-1, at 7– 10.  On December 5, 2018, Plaintiff filed a Cross-Motion for Summary Judgment, challenging

the application of the exemption.   *See* Pl.'s Opp'n & Cross-Mot. for Summ. J., ECF No. 17, at 3–10.

Exemption 7(E) consists of two elements that must be satisfied to justify withholding a document.   First, the requested information must be compiled for law enforcement purposes.   *See* 5 U.S.C. § 552(b)(7).   Second, the requested information must "disclose techniques and procedures for law enforcement investigations or prosecutions, or [] disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."   *Id.* § 552(b)(7)(E); *see also Blackwell v. FBI*, 646 F.3d 37, 41–42 (D.C. Cir. 2011).   Because Plaintiff conceded the first element, only the second element was at issue—specifically, whether Defendants had identified a law enforcement technique or procedure that would be disclosed if the redacted material were released.   *Whittaker v. U.S. Dep't of Justice*, No. 18-cv-01434 (APM), 2019 WL 2569915, at *1 (D.D.C. June 21, 2019).   After considering both parties' arguments and Defendants' accompanying declaration, the court denied both summary judgment motions.   *Id.* at *3.   It concluded that Defendants had not identified with reasonable specificity what techniques or procedures were involved in Plaintiff's National Agency Check results and how they would be disclosed.   *Id*.   The court afforded Defendants the opportunity to renew their motion.

On October 3, 2019, Defendants filed a supplemental declaration explaining their invocation of Exemption 7(E) and renewed their motion for summary judgment.   *See* Defs.' Mot.; *id.*, Second Hardy Decl., ECF No. 26-2 [hereinafter Second Hardy Decl.].   On November 1, 2019, Plaintiff renewed his Cross-Motion for Summary Judgment.   *See* Pl.'s Opp'n to Renewed Mot. for Summ. J. & Renewed Cross-Mot., ECF. No. 27 [hereinafter Pl.'s Opp'n].

### III.   LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed R. Civ. P. 56(a).   When a court applies this standard, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).   A dispute is "genuine" only if a reasonable factfinder could find for the nonmoving party, and a fact is "material" only if it can affect the outcome of litigation.   *Id.* at 248–49.

FOIA cases are often decided on motions for summary judgment.   *See Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009).   A court may award summary judgment in a FOIA case using solely the information included in the agency's affidavits or declarations if they are "relatively detailed and non-conclusory," *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citations and internal quotation marks omitted), describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith," *Mil. Audit Project v. Casey,* 656 F.2d 724, 738 (D.C. Cir. 1981)).   "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible."   *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007) (cleaned up).

### IV.   DISCUSSION

Defendants offer two separate but related justifications for their withholding of Plaintiff's National Agency Check results.   First, they assert that the investigative information contained within Plaintiff's results might, in isolation, illuminate the techniques and procedures used to

4

gather that information.   Defs.' Mem. at 7.   Second, they argue that disclosure of Plaintiff's name

check results, when aggregated with similar results for other individuals, could tip off FOIA

requesters and would-be lawbreakers as to how the FBI strategically allocates its limited

investigative and enforcement resources.   *See id.* at 6.   The court addresses each justification in

turn.

### A.      The Direct Effects of Disclosing Plaintiff's Results

In its earlier opinion, the court stated that Defendants needed to clarify with "reasonable

specificity" (1) what procedures or techniques are involved with the National Agency Check and

(2) how they would be disclosed.   *Whittaker*, 2019 WL 2569915, at *3 (cleaned up).   Because

Defendants have done both here, they have satisfied their burden under Exemption 7(E).

Defendants note that a "broad range of specific investigative techniques and procedures

would be put at risk if the FBI began disclosing name check results."   Second Hardy Decl. ¶ 10.

They provide examples, including the following:

> [I]f a criminal involved in unlawful cyber intrusions was subject to
> a name check and learned the FBI found no information concerning
> her, she could positively determine the FBI currently had not
> detected her cybercrimes.   This would provide her information
> suggesting that the FBI may not possess the technology necessary
> to detect her criminal behavior or may expose the limitations of the
> FBI's technological capabilities to detect and deter certain types of
> cybercrimes.   This would enable the criminal to make an informed
> decision on how she may successfully continue to commit crimes
> without detection by the FBI.   Conversely, if this same criminal
> found the FBI had located information on her, she could conclude
> the FBI had likely detected her commission of cybercrimes.   This
> would allow her to pre-emptively destroy evidence of her crimes,
> and/or modify the means by which she commits her criminal acts
> . . . to avoid further detection or disruption by the FBI.

*Id.*   Plaintiff counters that such examples do not reasonably specify the techniques and procedures

at risk *in this case*, because they have no connection to the information withheld from Plaintiff.

5

*See* Pl.'s Opp'n at 3 (asserting that the Second Hardy Declaration "*never* makes *any* attempt to contend or explain how *any* technique is implicated by Plaintiff's request").   Defendants reply that stating the precise techniques or procedures implicated by Plaintiff's specific name check results "would defeat entirely the purpose of withholding."   Defs.' Reply in Supp. of Mot., ECF No. 31 [hereinafter Defs.' Reply], at 7.

The court agrees with Defendants.   The FBI applies a categorical withholding policy in part because revealing the underlying information could compromise the techniques and procedures that produce that information.   Second Hardy Decl. ¶ 7.   Even in cases where the National Agency Check results contain no derogatory information, a requester could discover that the FBI lacks the methods necessary to capture or track the requester's illicit behavior.   *See id.* ¶ 10.   If the FBI were to reveal any specific techniques or procedures associated with Plaintiff's results, Plaintiff would be made aware of those methods' use as to his own activity, which would "reduce or nullify their effectiveness," *Vazquez v. U.S. Dep't of Justice*, 887 F. Supp. 2d 114, 116 (D.D.C. 2012), *aff'd*, No. 13-cv-5197, 2013 WL 6818207, at *1 (D.C. Cir. Dec. 18, 2013) (per curiam).   Factoring in those legitimate concerns, the court believes Defendants have reasonably specified the types of techniques and procedures they intend to protect by withholding Plaintiff's results.   *See Am. Immigr. Lawyers Ass'n v. U.S. Dep't of Homeland Sec.*, No. 1:16-cv-02470 (TNM), 2020 WL 5231336, at *5 (D.D.C. Sept. 2, 2020) (finding "untenable" the plaintiff's demand for more detail about techniques and procedures where "[i]t would require disclosure of the very details that create the risk that a law will be circumvented in the first place").

The cases Plaintiff highlights are not at odds with the court's conclusion.   In *Citizens for Responsibility & Ethics in Washington v. U.S. Department of Justice*, the Circuit ruled against the agency because it had done no more than provide a "near-verbatim recitation of the statutory

standard."   746 F.3d 1082, 1102 (D.C. Cir. 2014).   The court clarified that "the agency must at least provide *some* explanation of what procedures are involved and how they would be disclosed." *Id*.   As illustrated above, Defendants have provided examples of what types of techniques and procedures are at stake and how releasing the withheld name check information would disclose them.   *See* Second Hardy Decl. ¶ 10.   Those examples clearly go beyond mere regurgitation of the statutory standard for Exemption 7(E) and instead provide the court with the minimal explanation necessary to justify Defendants' withholding.

Plaintiff cites *Blackwell v. FBI*, 646 F.3d 37 (D.C. Cir. 2011), and *Mayer Brown LLP v. IRS*, 562 F.3d 1190 (D.C. Cir. 2009), as cases that "demonstrate the logical relationship between disclosure and harm to law enforcement techniques and procedures."   Pl.'s Opp'n at 5–6.   In *Blackwell*, the plaintiff was convicted of insider trading and related offenses, and he requested from the FBI documents regarding his investigation and prosecution.   646 F.3d at 39.   The FBI withheld certain information under Exemption 7(E), claiming that disclosure would compromise "details about procedures used during the forensic examination of a computer," and the Circuit found the agency's explanation satisfactory.   *Id.* at 42.   In *Mayer Brown*, the plaintiff filed a request for information on the IRS's settlement practices for lease-in/lease-out ("LILO") arrangements, which the IRS had made illegal in 2004.   562 F.3d at 1191.   The Circuit upheld the agency's invocation of Exemption 7(E), noting that, "[t]hough the information . . . does not necessarily provide a blueprint for tax shelter schemes, it could encourage decisions to violate the law or evade punishment."   *Id.* at 1193.

Neither case undercuts the court's reasoning.   True enough, the techniques and procedures at issue in *Blackwell* and *Mayer Brown* were more precisely defined than those identified by Defendants.   But that makes sense because the relevant factual circumstances in those cases

permitted such definition.   In *Blackwell*, the FBI revealed nothing new to the plaintiff or outside observers when it admitted that the implicated procedure involved computer examination—after all, the plaintiff had been convicted of insider trading.   And in *Mayer Brown*, all parties already knew that the withheld information related to LILO settlement practices—that was the point of the FOIA request in the first place.   This case is different.   The National Agency Check requires determining "whether a specific individual is the subject of or mentioned in *any* FBI investigation(s)."   Defs.' First Mot., Ex. B, Decl. of David M. Hardy, ECF. No. 16-4, ¶ 13 (emphasis added).   So, the name check results could reveal derogatory information (or lack thereof) that could shed light on any number of different law enforcement techniques and procedures.   Because—unlike in *Blackwell* or *Mayer Brown*—Plaintiff currently has no sense of which techniques or procedures are intertwined with his name check results, Defendants risk reducing or nullifying the effectiveness of those techniques and/or procedures if they were to describe them with any greater specificity.   *See* Second Hardy Decl. ¶ 5 ("[R]evealing the results of a name check runs the significant risk of revealing the underlying technique/procedure as the recipient learns of what activity the FBI observed (or did not observe).").   In short, because there is good reason for Defendants to describe the implicated law enforcement methods at a higher level of generality, Plaintiff's comparisons to *Blackwell* and *Mayer Brown* are inapposite.

If anything, this case is more like *Kalu v. Internal Revenue Service*, where the court permitted the government's refusal to confirm or deny whether the plaintiff was on any kind of terrorist watchlist.   159 F. Supp. 3d 16, 21 (D.D.C. 2016).   Although *Kalu* involved a *Glomar* response, the FBI invoked Exemption 7(E).   *Id.* at 23.   And the agency's rationale for nondisclosure—which Plaintiff admits is "compelling logic," Pl.'s Opp'n at 5—resembles the FBI's reasoning here, *see* 159 F. Supp. 3d at 23 (noting that "individuals could inductively piece

together what types of activities or behaviors may or may not attract the watchful eye of the federal government").   Similar to *Kalu*, "the FBI categorically withholds name check results . . . because the results identify 'gathered intelligence on particular subjects' and 'reveal' when 'activities have been detected.'"   Defs.' Reply at 5–6 (quoting Second Hardy Decl. ¶ 9).

Plaintiff also contends that Defendants' invocation of Exemption 7(E) improperly "entails a focus on *information* rather than the techniques of gathering it," the latter being the true subject matter covered by the exemption.   Pl.'s Reply in Opp'n to Defs.' Mot. for Summ. J., ECF No. 33 [hereinafter Pl.'s Reply], at 2.   But that argument misunderstands the logic behind Defendants' theory of withholding.   The information revealed in the name check results—derogatory or otherwise—would allow requesters and others "to evaluate, based on the types of criminal behavior they are/were engaged in, the existence of particular FBI investigative techniques/procedures capable of detecting certain violations of criminal or national security laws and/or the limitations of its investigative techniques and procedures for gathering particular evidence."   Second Hardy Decl. ¶ 9.   In other words, disclosing information risks revealing the underlying techniques and procedures used to gather information about a person, and that is Defendants' ultimate—and valid—concern.   Plaintiff points to no case—and the court is not aware of one—that requires the undisclosed information to *explicitly* reveal the specifics of a technique or procedure before it can be withheld under Exemption 7(E).   Again, Defendants need only demonstrate that the disclosure would "reduce or nullify" the effectiveness of the underlying method, *Vazquez*, 887 F. Supp. 2d at 116, and they have done so here.

### B.   Defendants' "Mosaic" Theory for Withholding

Relatedly, Defendants also offer what the FBI characterizes as a "mosaic" theory of withholding.   *See* Second Hardy Decl. ¶ 11.   A mosaic theory posits that separate disclosures of

otherwise innocuous information could be assembled by a requester or other person to reveal "how, when, [and] under which circumstances[] certain techniques are employed" by law enforcement and investigative agencies.  *See Rep.'s Comm. for Freedom of the Press v. FBI*, 2020 WL 1324397, at *11 (D.D.C. Mar. 20, 2020).   Thus, the only way to prevent anyone from constructing the broader "mosaic" is to shield each individual piece from disclosure.   The theory "finds support in both Supreme Court and D.C. Circuit precedent" and "[a]s a result, in cases implicating national security, courts have permitted the government to rely on [a mosaic approach] to justify withholding agency records that form only a small piece of the larger puzzle."  *Shapiro v. U.S. Dep't of Justice*, 239 F. Supp. 3d 100, 115 (D.D.C. 2017) (cleaned up) (accepting the FBI's mosaic justification for its invocation of 7(E)).

Here, Defendants assert that disclosing name check results "could reveal key information about the FBI's strategic distribution of its limited investigative resources."   Second Hardy Decl. ¶ 11.   "Even if an individual name check result might seem innocuous, when pieced together with other name check results, inferences drawn from those results, and associated bits of information, a picture can start to form about how the FBI uses its resources."  *Id.*   For example:

> [I]f name check results for numerous individuals are disclosed, and a subset of those individuals all know that they participate in a particular type of crime in a particular geographic area, and their name check results are all derogatory, they may . . . determine that the FBI has dedicated significant resources to detect the specific crime within their geographic region, and as a result, attempt to move their base of operations to a different region, or shift to [a] different type of crime that they surmise is of less investigative interest to the FBI as a way to circumvent the law.

*Id.*   Plaintiff does not dispute that the FBI's strategic allocation of resources qualifies as a law enforcement technique or procedure.   *See* Pl.'s Reply at 5–6.   Instead, he argues that the mosaic harm identified by Defendants is unrealistic and therefore should be disregarded.   *See id.* at 5 ("At

what point do [t]he Defendants engage in the 'rank speculation' or conjecture [with which] they charge the Plaintiff?"); *id.* ("A review of a claim for exemption under 7(E) while highly deferential, is not vacuous." (cleaned up)).   Yet, Plaintiff understates just how low the threshold is to satisfy Exemption 7(E)'s "circumvention of the law" requirement.   As the Circuit emphasized in *Mayer Brown*, the exemption "looks not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk." 562 F.3d at 1193.   Although the court is not in a position to assess with precision the likelihood of Defendants' asserted harms, it is satisfied that Defendants have demonstrated *some* chance that disclosure of Plaintiff's name check results risks circumvention of the law via a mosaic effect.

This result is entirely consistent with the only other case in this jurisdiction that addresses the application of Exemption 7(E) to National Agency Check results.   *See Schneider v. U.S. Dep't of Justice*, No. 18-cv-0474 (DLF), 2019 WL 4737059 (D.D.C. Sept. 28, 2019).   In *Schneider*, the FBI advanced essentially the same rationale for its withholding.   *Id.* at *5 ("By submitting multiple requests, bad actors could track information about the nature, size, location, status, and classification of an investigation and use it in aggregate to impede or circumvent current or future investigations.").   After noting that the exemption "sets a relatively low bar for the agency to justify withholding," *id.* (quoting *Blackwell*, 646 F.3d at 42), the *Schneider* court concluded that the FBI "ha[d] logically established that releasing certain investigative information relating to Schneider's . . . name check results" would "reduce or nullify the effectiveness of certain law enforcement techniques," *id.* (cleaned up).   The court is similarly persuaded that the FBI's withholding here is justified under Exemption 7(E).

## V.       CONCLUSION

For the reasons stated, Defendants' Renewed Motion for Summary Judgment is granted. Plaintiff's Renewed Cross-Motion for Summary Judgment is denied.   A separate final order accompanies this Memorandum Opinion.

Dated:   October 15, 2020

_____
Amit P. Mehta
United States District Court Judge